**KISSIMMEE RIVER VALLEY SPORTSMANS ASSOCIATION, Plaintiff,**

v.

**The CITY OF LAKELAND, Defendant.**

No. 99–335–Civ–T–17E.

United States District Court, M.D. Florida, Tampa Division.

Aug. 17, 1999.

R. Gale Porter, Jr., Tampa, FL, for Kissimmee River Valley Sportsmans Association, plaintiff.

Mark Nelson Miller, Lane, Trohn, Bertrand, & Vreeland, P.A., Lakeland, FL, for City of Lakeland, defendant.

### ORDER ON DEFENDANT'S MOTION TO DISMISS

KOVACHEVICH, Chief Judge.

This cause comes before the Court on Defendant CITY OF LAKELAND's

amended motion to dismiss and supporting memorandum (Docket Nos. 7–8); and Plaintiff KISSIMMEE RIVER VALLEY SPORTSMANS ASSOCIATION's response (Docket No. 13).

## STANDARD OF REVIEW

Plaintiff's complaint should not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court must also accept the plaintiff's well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In deciding a motion to dismiss, a court can examine only the four corners of the complaint. *Rickman v. Precisionaire, Inc.,* 902 F.Supp. 232 (M.D.Fla.1995). The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low. *Ancata v. Prison Health Servs.,* 769 F.2d 700, 703 (11th Cir.1985). However, when, on the basis of a dispositive issue of law, no construction of the factual allegations of a complaint will support the cause of action, dismissal of the complaint is appropriate. *Powell v. United States,* 945 F.2d 374 (11th Cir. 1991); *Executive 100, Inc. v. Martin County,* 922 F.2d 1536 (11th Cir.1991).

## BACKGROUND

### I. Federal Statutory Framework

The Federal Aid in Sportfish Recreation Act, 16 U.S.C. §§ 777a–k, [hereinafter "the Act"] apportioned funds for fish restoration and management projects to coastal states, including Florida. § 777(b). The Act defines "fish restoration and management projects" as "projects designed for restoration and management of all species of fish which have material value in connection with sport or recreation in the marine and/or fresh waters of the United States." 16 U.S.C. § 777a(1).

To become eligible to receive funds under the Act, a state must submit "a comprehensive fish and wildlife management plan which shall insure the perpetuation of those resources for the economic, scientific, and recreational enrichment of the people." 16 U.S.C. § 777e(1). States are required to allocate fifteen (15) percent of the funds allocated under the Act to "acquisition, development, renovation, or improvement of facilities ... that create, or add to, public access to the waters of the United States to improve the suitability of such waters for recreational boating purposes." 16 U.S.C. § 777g(b).

The regulations promulgated by the Department of the Interior pursuant to the Act require states to allocate at least ten (10) percent of the funds apportioned for "recreational boating access facilities." 50 C.F.R. § 80.24. The regulation further requires that the facilities must accommodate "power boats with common horsepower ratings" and "must make reasonable efforts to accommodate boats with larger horsepower ratings if they would not conflict with aquatic resources management." *Id.*

### II. Facts

The facts as stated are taken from the complaint (Docket No. 1). Plaintiff Kissimmee River Valley Sportsmans Association [hereinafter "the Association"] is a group of recreational boaters and fisherman. One of the Association's stated purposes is to educate its members and the general public about protecting and preserving public access to navigable lakes, rivers, streams, and all public lands for traditional recreational uses such as hunting, fishing, boating, camping, and hiking.

The Association challenges the legality of Lakeland City Code Section 58–32, which states that "[i]t shall be unlawful for any person to operate any airboat upon any of the lakes within the city," with certain exceptions for governmental agencies. Section 58–32 goes on to define "airboat" as "any boat, sled, sea skiff, or

swamp boat pushed, pulled or propelled by air power generated by a motor of more than 25 horsepower." The ordinance was passed by the Lakeland City Commission on April 1, 1985, and states that it was passed in recognition of the fact that the level of noise generated by airboats creates a nuisance and is a danger to people and wildlife. *See* Proposed Ordinance No. 85–56.

The Association alleges that the Act and its interpretative regulations create an enforceable federal statutory right for equal access for boats of common horsepower ratings at boat launch facilities constructed or maintained under the Act. It further alleges that the airboats used by its members are power boats with common horsepower ratings. The Association alleges that its members have suffered an actual injury because of Section 58–32, in that its members have been prevented from using their airboats on the bodies of water covered by the Act, and that at least one of its members has been arrested and charged with violating that code section.

Count I of the complaint is a claim under 42 U.S.C. Section 1983, alleging that Section 58–32 deprives the members of the Association of its federal statutory rights under the Act and the regulations promulgated pursuant to the Act. The Association also brings several pendant state law claims. Count II is a claim for declaratory relief, alleging that Section 58–32 is expressly prohibited by Section 327.02, Florida Statutes. Count III is a claim for declaratory relief, alleging that section 58–32 conflicts with Section 372.7701, Florida Statutes. Count IV is a claim for declaratory relief, alleging that the subject matter of Section 58–32 is expressly preempted by Section 327.60, Florida Statutes.

## ANALYSIS

■ Defendant City of Lakeland [hereinafter "the City"] moves for dismissal of Count I of the complaint on the following grounds: (1) the Act does not create a federal right enforceable under Section 1983, (2) the Act does not apply to municipalities, (3) the complaint fails to allege

that Lakeland received federal funds pursuant to the Act or otherwise assented to the Act's provisions, and (4) the claim was not brought within the applicable statute of limitations. The Court finds it necessary to address only the first of these grounds, because Supreme Court and Eleventh Circuit caselaw requires a holding that the Act does not create a federal right enforceable under Section 1983.

The Association argues that the Act and the regulations promulgated pursuant to the Act create a federal right enforceable under Section 1983. The Association relies on *Buckley v. City of Redding*, 66 F.3d 188 (9th Cir.1995), in which the Ninth Circuit concluded that such a right was created. The Ninth Circuit applied the following test, set forth in *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990):

> (1) whether the statutory provision at issue was intended to benefit the putative plaintiff; (2) whether the provision creates a binding obligation on the state rather than a mere congressional preference; and (3) whether the asserted interest is not so amorphous as to be beyond the competence of the judiciary to enforce.

*Buckley*, 66 F.3d at 190 (citing *Wilder*, 496 U.S. at 509, 110 S.Ct. 2510).

The City argues that the Ninth Circuit's holding in *Buckley* is not consistent with the test set forth in the Eleventh Circuit case *Harris v. James*, 127 F.3d 993 (11th Cir.1997), for determining when an interpretive regulation creates a federal right. Significantly, the *Buckley* court found an enforceable right based on the regulations interpreting the Act, rather than on the Act itself, but did not consider whether the statute itself created a federal right. The City further points out that at the time of its decision in *Buckley*, the Ninth Circuit did not have the benefit of the Supreme Court's decision in *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), on which the Eleventh Circuit relied in part for its decision in *Harris*.

In *Blessing*, the Supreme Court considered whether the provision of the Social Security Act requiring that each state must operate a child support enforcement program, known as Title IV–D, creates an enforceable right "to have the State's program achieve 'substantial compliance' with those provisions." *Id.* at 333, 117 S.Ct. 1353. The Court held that the lower court had erred in finding the existence of such a right based on the statute because the requirement that states achieve substantial compliance with Title IV–D did not create an "*individual* entitlement to services," but was a means to "measure the *system-wide* performance of a State's Title IV–D program." *Id.* at 343, 117 S.Ct. 1353 (emphasis in original). Nor did the regulations interpreting Title IV–D to require "sufficient staff to fulfill certain functions" create an enforceable right, the Court held. *Id.* at 345, 117 S.Ct. 1353. The Court stated that the link between the requirements of the regulation and "the services provided to any particular individual is far too tenuous to support the notion that Congress meant to give each and every Arizonian who is eligible for Title IV–D the right to have the State Department of Economic Security staffed at a 'sufficient' level." *Id.*

In *Harris*, the Eleventh Circuit considered "whether Medicaid recipients have a federal right to transportation which may be enforced in an action under § 1983." 127 F.3d at 996. Like the issue before this Court, that question required the *Harris* court to consider whether the regulations interpreting a federal statute created an enforceable right. *See id.* at 1005. The *Harris* court acknowledged that there is a split in the circuits on this issue, but stated that in its view, "the driving force behind the Supreme Court's case law in this area is a requirement that courts find a Congressional intent to create a particular federal right." *Id.* at 1008. The court therefore rejected the approach of "finding enforceable rights in any valid administrative interpretation of a statute that creates some enforceable right." *Id.* It recognized that "so long as the statute

itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute ... may create a federal right as further defined by the regulation." *Id.* at 1009. In contrast, however:

if the regulation defines the content of a statutory provision that creates no federal right under the three-prong test [developed in *Wilder* and *Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) ], or if the regulation goes beyond explicating the specific content of the statutory provision and imposes distinct obligations in order to further the broad objectives underlying the statutory provision, we think the regulation is too far removed from Congressional intent to constitute a "federal right" enforceable under § 1983.

127 F.3d at 1009.

In *Doe v. Chiles*, 136 F.3d 709 (11th Cir.1998), the Eleventh Circuit considered whether developmentally delayed Medicaid recipients have a enforceable federal right to have Medicaid assistance furnished with reasonable promptness. In that case, the Eleventh Circuit distinguished the case before it from *Harris*. The *Doe* court noted that the source of the right addressed in *Harris* was a federal regulation, while the question before it involved a right created by a federal statute. *Doe*, 136 F.3d at 714–15. It stated that the statutory provision at issue "presents a sufficiently specific and definite standard readily susceptible to judicial assessment." *Id.* at 717. The regulations interpreting the statute "further define[d] the contours of the statutory right." *Id.*

The question this Court must resolve is whether the Act itself creates a right which the regulation in question merely "fleshes out" or "defines the contours of," or whether the regulation instead imposes "distinct obligations in order to further the broad objectives underlying" the Act. The Association states that the Act was intend-

ed to benefit sport fishermen by improving public access to navigable public waters, and that the regulation defines the contours of this right by requiring that power boats be accommodated facilities created pursuant to the Act. The Association argues that the statute thus confers a right of public access for "sport fisherman utilizing state waters serviced by federally funded boat launch facilities." (Pl.Resp. at 8).

The Association's argument is not consistent with the Supreme Court and Eleventh Circuit caselaw on this issue. The Association concedes that the Act itself does not grant public access to the waters involved, but instead provides funds so that the waters may be improved for recreational uses. The link between the statute's provision of funds for boating facilities and the regulation's requirement that the facilities accommodate all power boats with motors of a particular size is too remote for the Court to assume that Congress intended to create the right of access for which the Association argues. *See Blessing,* 520 U.S. at 345, 117 S.Ct. 1353.

Requiring the accommodation of power boats may further the broad objective of the Act by allowing the improved waters to support a full range of recreational uses. The regulation is not, however, merely the "fleshing out" of a right created by the Act. Under the test set forth in *Harris,* therefore, the statute under which the Association seeks to bring its Section 1983 action does not create an enforceable federal right. That claim will therefore be dismissed.

The Court would further note that it is not clear that even the regulation itself grants the right of access for which the Association argues. The regulation requires that boat launch facilities created with funds apportioned by the Act accommodate power boats with common horsepower ratings. While the interpretation of this regulation is not a question before the Court, the language of the regulation seems to the Court to be directed at the appropriate scale and type of boat launch facilities to be funded under the Act. It does not appear to forbid ordinances limiting or prohibiting the use of types of power boats that may create a nuisance or a hazard.

 The City further moves for dismissal of the pendant state claims if Count I is dismissed. Dismissal of these claims is appropriate, because they present no federal questions and diversity does not exist. Accordingly, it is

**ORDERED** that Plaintiff's Complaint be **DISMISSED** with prejudice.

**DONE AND ORDERED.**